**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHALEEN KOSIBA, et al., | : | CIVIL ACTION NO. 98-3571 (MLC) |
|  | : |  |
| Plaintiffs, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| MERCK & COMPANY, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

**COOPER, District Judge**

Plaintiff Celeslie Epps-Malloy ("Epps-Malloy") commenced this action on July 30, 1998, seeking relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, against Merck & Company ("Merck"), UNUM Life Insurance Company of America ("UNUM"), and the Merck & Company, Inc. Long Term Disability Plan for Union Employees ("Plan") (collectively "Defendants").  On remand from the Third Circuit Court of Appeals, this matter is before the Court on motions for summary judgment regarding the termination of Epps-Malloy's long-term disability ("LTD") benefits.  The Court is called upon to determine whether this termination was arbitrary and capricious, and thus unlawful pursuant to 29 U.S.C. § 1132(a)(1)(B).  The Court determines the motions without oral argument.  Fed.R.Civ.P. 78(b).  For the reasons given in this Memorandum Opinion, the Court will deny Defendants' motion for summary judgment and grant Epps-Malloy's motion for summary judgment.

**BACKGROUND**

Epps-Malloy was a cook and food service attendant at Merck. (Dkt. entry no. 25, 5-1-00 Aff. of Epps-Malloy ("Epps-Malloy Aff.") at ¶ 2.)  Her general cafeteria duties included customer service, food preparation, stocking supplies, and certain cleaning responsibilities.  (Id.)  In May 1991, while she was putting trays in a server bin, several trays fell on her.  (Id. at ¶ 3.)  Because of pain and swelling, she was unable to return to work.  (Id.)  At the time of the incident, Epps-Malloy was a participant in the Plan, which provides benefits to participating members who become disabled and are unable to perform the material aspects of their occupation.  (Dkt. entry no. 24, 4-24-00 Aff. of Gloria Dukes ("Dukes Aff.") at ¶¶ 2, 6.)  To be eligible for benefits, a participant must: (1) complete the "Total Disability Eligibility Period;" and (2) satisfy the definition of "Total Disability."  (Dkt. entry no. 60, Def. Tr. Br., Ex. 1, Plan.)[1]  According to Defendants, a participant has the burden to prove that he or she satisfies this definition of

---

[1] "The Total Disability Eligibility Period" is defined as "continuous Total Disability for 26 consecutive weeks."  (Plan at 11.)  "Total Disability" during the Total Disability Eligibility Period and the first two years of benefit payments is defined as "the complete and continuous inability of the Participant to perform any and every duty of the Participant's occupation" (the "own-occupation" standard).  (Plan at 8.)  After that time, the Participant must be unable to "engage in any gainful employment for which the Participant is or may become reasonably qualified by education, training or experience" (the "any-occupation" standard).  (Id.)

2

total disability.  (Dukes Aff. at ¶ 8; Def. Tr. Br. at 17.)[2]
Under the Plan's administrative structure, Merck acts as the
"Plan Administrator" (Plan) and UNUM acts as the current "Claims
Administrator."  (id.; Dukes Aff. at ¶ 2).[3]  The Plan further
provided that Plan benefits can be offset against other benefits,
including Social Security disability ("SSD") payments.  (Plan.)

In April 1992, Epps-Malloy applied for benefits under the
Plan.  (Def. Tr. Br. at 6.)  Between April 1992 and September
1992, four medical professionals compiled separate reports
regarding her condition.  (Epps-Malloy Aff. at ¶¶ 7-11.)
In a report dated April 15, 1992, Dr. Horia A. Schwartz ("Dr.
Schwartz"), a physician apparently specializing in physical
medicine and rehabilitation, gave the following diagnosis and
opinion following an examination:

---

[2] The Plan required any employee "receiving a benefit under
this Plan to undergo a medical examination by physician or
physicians designated by the [Plan] Administrator and to provide
other evidence of continuing disability."  (Plan.)

[3] The "Plan Administrator" is the entity with "sole
responsibility for the administration of the plan."  (Plan.)  It
is responsible for making factual determinations and interpreting
the Plan, as well as correcting and resolving any defects,
omissions, inconsistencies, and questions, except as delegated to
the Claims Administrator.  (Id.)  This entity is also responsible
for deciding questions of eligibility and participation, except
as so delegated.  (Id.)
The "Claims Administrator" makes "all determinations as to
the right of any person to a benefit under the Plan."  (Plan.)
When Epps-Malloy first filed for LTD benefits under the Plan,
Thomas L. Jacobs and Associates was responsible for claims
administration.  UNUM subsequently assumed the role of Claims
Administrator.  (Dukes Aff. at ¶ 2.)

3

Diagnosis:  Permanent residuals of extensive musculoskeletal
disorder with evidence of severe fibromiralgia [sic],
myofascitis, or in essence myopathy.  It is obvious that her
condition has been probably precipitated by the stressful
physical activity as well as by her specific underlying
disorder, sarcoidosis.

Commentary:  Until a few years ago, it was considered that
sarcoidosis was a disease of unknown ethology [sic] which is
progressive in nature and would render a person totally
disabled as time passes by.  In the last few years, several
articles have been written about connecting the sarcoidosis
with stressful physical activities, but that was more on a
"tentative" basis rather than specific proof.  The bottom
line is that anybody with an underlying diagnosis of
sarcoidosis, whether or not they know about it or not, will
have the entire spectrum of disability and symptomatology in
a gradual and worsening fashion.  It appears that in this
particular instance that she developed the symptoms
simultaneously with her being diagnosed as having
sarcoidosis and it is entirely within the realm of medical
probability that the type of work performed by her
aggravated or precipitated the sarcoidosis.  However, the
sarcoidosis is not due to her trauma, although her
"disorder" is definitely due to sarcoidosis.

In conclusion, we have a relatively young woman who suffers
with severe musculoskeletal disorder, essentially
pathological joint disease, bowel syndrome, etc., all
connected with sarcoidosis as well as aggravated by the
physical work activities, which renders her at present
totally disabled, from the orthopedic standpoint.

It is highly unlikely that she will improve and that she
will be able to do any kind of stressful physical activity
in the future.  Unless, of course, a new method of treatment
is developed, either medical or otherwise, it is expected
that she will progressively deteriorate.  To what rate,
nobody knows - it is strictly individual.  In essence, Ms.
Epps is no longer capable of working at her occupation or at
any occupation that requires prolonged immobilization, such
as even a sedentary position and definitely not in any
occupation that requires physical activities.[4]

---

[4] Sarcoidosis is a "systemic granulomatous disease of
unknown cause, especially involving the lungs with resulting
interstitial fibrosis, but also involving lymph nodes, skin,

(Dkt. entry no. 60, Administrative Record ("A.R.") at 360, 362, 4-15-92 Letter from Dr. Schwartz ("Dr. Schwartz Report").)[5]

Dr. Paul J. Kiell, a neurologist who examined Epps-Malloy on April 28, 1992, concluded that she suffered from chronic pain syndrome and neuropsychiatric disability.  (A.R. at 374-76, 4-28-92 Letter from Dr. Kiell.)  An independent medical examiner, Dr. Frederick D. Gangemi, examined Epps-Malloy on June 30, 1992 and found that she suffered from fibromyalgia and noted the possibility that this "myofasial [sic] pain syndrome" was related to stressful work activities.[6]  (A.R. at 384-85, 7-17-92 Letter from Dr. Gangemi.)  The report stated that, although physical therapy treatments would provide only short-term, temporary relief, an exercise program would reduce her pain and stiffness and give her an enhanced sense of well being.  (Id. at 384-85.) Rik Couwenberg, P.T. ("Couwenberg"), performed an Independent Functional Capacity Assessment ("FCA") on Epps-Malloy on

---

liver, spleen, eyes, phalangeal bones, and parotid glands." Stedman's Medical Dictionary, STEDMANS 363870 (27th ed. 2000). A treatment therapy can last for one or two years; however, some affected with the disease require lifelong therapy.  Id.

[5] The letter is dispersed across the Administrative Record. Page one can be found at 348 and page three at 362.

[6] Fibromyalgia is a "syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest)."  Stedman's Medical Dictionary, STEDMANS 148730 (27th ed. 2000).

September 4, 1992 to determine "the extent of the claimant's restrictions and limitations," as requested by her insurer. (A.R. at 327, 8-24-92 Engagement Letter from Joy Moyer; A.R. at 306, 9-4-02 Letter from Rik Couwenberg ("Couwenberg Report").) Couwenberg recommended that Epps-Malloy not return to work and stated that the prognosis for her attaining a "light physical demand classification" was poor if she in fact suffered from fibromyositis and given the past lack of success with physical therapy treatments.  (Id. at 303.)[7]

In October 1992, Epps-Malloy was approved for LTD benefits. (A.R. at 406, 10-9-92 Letter from Jean J. Copp.)  She was informed that, under the Plan, she would receive benefits for twenty-four months if she remained totally disabled from returning to her previous job.  (Id.)  After that two-year period, benefits would be extended upon a determination that she was disabled from any occupation she was reasonably qualified for "by education, training or experience."  (Id.)

As the two-year limit approached, information was requested from Epps-Malloy's then-treating physician, Dr. Randolph Stein ("Dr. Stein") in March 1993.  (Epps-Malloy Aff. at ¶¶ 15-16.) Dr. Stein diagnosed her with fibromyalgia as well as chronic pain

---

[7] Fibromyositis is defined as "chronic inflammation of a muscle with an overgrowth, or hyperplasia, of the connective tissue."  Stedman's Medical Dictionary, STEDMANS 148760 (27th ed. 2000).

syndrome.  (A.R. at 285, 3-23-93 Attending Physician's Statement ("Dr. Stein Report") at 1.)  He reported that Epps-Malloy's symptoms included pain in her arm, shoulder, neck, back, hip, and buttock area and concluded that she had reached maximum medical improvement.  (Id. at 285-86.)

Based on a review of the Administrative Record and a questionnaire completed by Epps-Malloy, Epps-Malloy was approved for "any-occupation" LTD benefits in October 1993.  (A.R. at 235, 10-5-93 Letter from Corey Bulluck; Dukes Aff. at ¶ 17; A.R. at 289-92, 6-30-93 Questionnaire.)  The notification letter explained that periodic requests for medical information or other documentation would be made in the future to ensure continued eligibility for benefits.  (A.R. at 235.)

Before this approval of "any-occupation" benefits, Epps-Malloy applied for SSD benefits on March 30, 1992.  (Epps-Malloy Aff. at ¶ 13.)  The Social Security Administration ("SSA") denied the application on December 14, 1992.  (A.R. at 281, 12-14-92 SSA Denial.)  On March 18, 1994, Epps-Malloy had a hearing before an administrative law judge ("ALJ"), who issued a decision on September 13, 1994.  (Id. at ¶¶ 13, 19; A.R. at 132, 9-13-94 SSA Decision.)  Epps-Malloy recalls forwarding a copy of this decision to UNUM or the Plan in September of 1994 as well as sending a facsimile to UNUM representative Daren Winckler in

November of 1995.  (Epps-Malloy Aff. at ¶ 21; A.R. at 130,

Facsimile Transmission Cover Sheet.)

The ALJ granted SSD benefits, finding that, because Epps-

Malloy could not perform a significant number of jobs in the

national economy, she satisfied the definition of disability

under the Social Security Act from May 14, 1991 until the date of

the SSA Decision.  (A.R. at 133-36, 9-13-94 SSA Decision.)  The

ALJ made a number of additional findings:

> 3.  The medical evidence establishes that the claimant
> has severe chronic pain syndrome, sarcoidosis; by
> history, but that she does not have an impairment or
> combination of impairments listed in, or medically
> equal to one listed in Appendix 1, Subpart B,
> Regulations No. 4.
> 4.  The intensity and persistence of the claimant's
> subjective complaints and alleged functional
> limitations are supported by the evidence.
> 5.  The claimant has the residual functional capacity
> to perform the physical exertion requirements of work
> except for inability to lift over five pounds,
> inability to stand, walk, or sit for sustained periods
> or perform these activities for over three to four
> hours in terms of an eight hours [sic] workday,
> inability to operate foot controls or do any climbing
> or balancing, and severely limited capacity to kneel,
> stoop, crawl, or crouch (20 CFR 404.1545).
> 6.  The claimant is unable to perform any of her past
> relevant works.
> 7.  The claimant's residual functional capacity for the
> full range of sedentary work is reduced by limitations
> shown in item 5.

(Id. at 135; see also id. at 132-33 (discussing and evaluating

evidence presented by Epps-Malloy).)

UNUM requested Dr. Stein to provide further medical

information in October 1994.  (A.R. at 217, 10-20-94 Letter from

8

Jodi Silberman.)  Again, Dr. Stein diagnosed Epps-Malloy with
fibromyalgia and chronic pain syndrome.  (A.R. 204, 10-26-94
Supplementary Medical Report ("Dr. Stein Supp. Report").)  Dr.
Stein noted that Epps-Malloy was unable to "perform physical
labor for any length of time," and concluded that he did not
expect her condition to improve sufficiently in the future.  (Id.
at 204-05.)  UNUM appears to have found Dr. Stein's report
sufficient to continue Epps-Malloy's LTD benefits.[8]

UNUM began another review of Epps-Malloy's disability status
in May 1996.  (A.R. 195, 5-22-96 Letter from Susan Spradlin.)
UNUM sought current information from Epps-Malloy regarding her
education and employment history and her treating physicians.
(Dukes Aff. at ¶ 18.)  Epps-Malloy completed the education and
employment history form.  (A.R. 199, Educ. & Emp't History Form.)
UNUM requested information from the two doctors Epps-Malloy
referred to as her treating physicians, a Dr. Pannullo and Dr.
David L. Williams ("Dr. Williams").  (Dukes Aff. at ¶ 19.)

Dr. Pannullo informed UNUM that Epps-Malloy had sarcoidosis
of the lung but that, as Epps-Malloy's gynecologist, she was not
treating her for this condition.  (A.R. 144, 6-12-96 Dr. Pannullo
Report.)  In a second UNUM questionnaire, Dr. Pannullo diagnosed
Epps-Malloy with "Postmenopausal Replacement."  (Id. at 145, 9-

---

[8] However, the Court cannot find a corresponding letter in
the Administrative Record.

10-96 Dr. Pannullo Report.)   Dr. Pannullo reiterated that she was

not treating Epps-Malloy for any illness and under return to work

prognosis she wrote "good."   (Id.)

Dr. Williams's notes, dated January 16, 1996, stated:

> . . . . [Epps-Malloy] has had a total hysterectomy in
> July of 1995 for a class 3 pap and will need
> gynecological follow up with a female gynecologist here
> when she is back in three months.  Also, in 1989 she
> had a diagnosis of sarcoidosis made by broncoscopy
> [sic] and we have records of an FEV1 of 2000.  She also
> has fibromyositis and has pain her left hip, back, and
> knee.  She also has had some severe rectal bleeding in
> the past but has been worked up and called diverticular
> disease.  She is on Premarin 1.25 mg daily.  When she
> has taken steroids in the past, she has had dramatic
> changes in her mood and became quite cushingoid.

(Id. at 189, 1-16-96 Dr. Williams Notes.)   According to Dr.

Williams's June 14, 1996 notes:

> Celeslie is in today.  We did a complete physical on
> her today.  Her BP is 135/85.  HEENT, HEART, LUNGS:
> within normal limits.  OROPHARYNX: benign.  NECK:
> supple.  THYROID: not enlarged.  CHEST: equal
> expansion bilaterally.  No dullness to percussion.  No
> lag nor rales.  HEART: no murmurs, heaves or thrills.
> BREASTS: no masses.  ABDOMEN: liver, kidneys, spleen
> nonpalpable.  PELVIC: performed from a normal
> appearing vagina.  She has had a hysterectomy.  RECTAL:
> no masses.  HEMOCCULT: negative stool.  EXTREMITIES:
> no cyanosis, clubbing or edema.  Bilateral mammography
> was ordered.  I have identified no new health problems
> today.  We are going to refill all of her medicines.  I
> have put her on Elavil 25 mg at night for fibromyalgia.
> She is going to bring in her medical records so we can
> make copies of them.  Sarcoidosis is her diagnosis as
> well as fibromyalgia.  Return visit in six months.

(Id., 6-14-96 Dr. Williams Notes.)

In a subsequent UNUM questionnaire, Dr. Williams concluded

that Epps-Malloy was "disabled to light activity because of

shortness of breath" and the prognosis for her to return to gainful full time or part time employment was "never."  (Id. at 128, 10-28-96 Dr. Williams Report.)  He further stated he had not recently conducted a pulmonary function test on her.[9]  (Id.) Follow-up visits were scheduled for every six months.  (Id.)

In a letter dated December 31, 1996, UNUM terminated Epps-Malloy's any-occupation LTD benefits.[10]  (A.R. at 120, 12-31-96 Letter from Dukes ("Init. Term. Letter").)  The letter explained that, based on the medical documentation received, including information from Drs. Pannullo and Williams, "there is no evidence to support that you are medically incapable to perform the duties of your occupation."  (Id.)  It further stated that Epps-Malloy could seek a review of this determination by the Plan Administrator, but it noted that this request for review must include objective medical evidence.  (Id.)

With a letter dated January 8, 1997, Epps-Malloy appealed this decision, informing UNUM that she was now under the care of

---

[9] Although no party specifically addresses the question, a pulmonary function test constitutes one of the tests used to diagnose sarcoidosis. See, e.g., Am. Lung Assoc., Sarcoidosis Symptoms, Diagnosis, and Treatment, http://www.lungusa.org/ lung-disease/sarcoidosis/symptoms-diagnosis.html (last visited 2-10-11) (stating that sarcoidosis is initially suspected based on x-rays, lab tests, and pulmonary function studies).

[10] Epps-Malloy claims she had a telephone conversation with senior benefits analyst Dukes (Dukes Aff. at ¶ 1), on or about November 25, 1996, in which she was informed that UNUM had lost many of her medical records.  (Epps-Malloy Aff. at ¶ 28.)

Dr. Fred D. McQueen, Jr. ("Dr. McQueen").  (A.R. at 114, 1-8-97

Letter from Epps-Malloy.)  She also submitted a completed medical

questionnaire sent to her by UNUM in November 1996.  (Id. at 115-

16, 11-25-96 Questionnaire.)  Following a letter from UNUM dated

January 10, 1997 (id. at 112, 1-10-97 Letter from Dukes), she

sent another letter, dated January 15, 1997, listing her current

medications.  (Id. at 109, 1-15-97 Letter from Epps-Malloy.)  At

UNUM's request, Dr. McQueen forwarded his notes from a visit with

Epps-Malloy on January 7, 1997 and information from her 1995

admission to Hamlet Hospital.  (Dukes Aff. at ¶ 26.)  Dr. McQueen

stated:

> I have a letter from Beth McKoy, stating that [Epps-
> Malloy] has fibromyositis and abnormalities of her
> blood work.  She had GGTP of 521, ALT of 60, SGOT of 51
> and alk phos 137, triglycerides of 109.  She is advised
> that I will try to cooperate with her and her attorney.
> She has severe sarcoidosis.  She is permanently &
> totally disabled by Social Security.  She has
> respiratory distress @ rest and may soon require Home
> O2.  The pt has been on medication:  cough syrup with
> codeine tid and I want her to change to Endal.  She is
> on Beconase AQ nasal inhaler for her sinuses and
> Darvocet for pain.  She has been dx'ed with
> fibromyositis and she is on hormone therapy, Preparing
> and PROventil inhaler.  I want her on Volmox (samples
> given).  She cannot return to gainful employment.  She
> has skin lesions appearing on her legs from the
> sarcoid.  Placing on steroid cream; Ultravate to use
> bid.  I do not feel it in her best interest to be under
> any stress due to triggering her sarcoid remission.
> She has had trigger pt injections in the past.  She has
> muscle spasms due to her disease process.  Placing on
> muscle relaxants and advised heat and no lifting,
> pulling or pushing.  She has problem with severe
> arthritis.  Permanently & totally disabled.  Suffers
> from severe anxiety.  She cannot cope with stress.

(A.R. at 94, Dr. McQueen Notes.)   The discharge summary from Epps-Malloy's Hamlet Hospital admission by Dr. Bharatkumar Thakkar noted that she underwent a hysterectomy and had a past medical history of sarcoidosis as well as rectal bleeding.  (Id. at 95, Hamlet Hosp. Discharge Summary.)   In additional notes from this admission, Dr. Thakkar stated that Epps-Malloy had a history of sarcoidosis, pancreatitis, and cholelithiasis.  (Id. at 97, Hamlet Hosp. Med. Record.)

According to Epps-Malloy, in a telephone conversation in January 1997, Dukes informed her that she did not "sound sick" and questioned Dr. McQueen's notes.  (Epps-Malloy Aff. at ¶ 38.) In February 1997, Nurse Ann Girardo ("Nurse Girardo") reviewed Epps-Malloy's file for UNUM.  (Dukes Aff. at ¶ 27.)   Commenting on Dr. McQueen's notes, Nurse Girardo wrote in full:

> Dr. Fred McQueen's 1/7/97 note includes subjective
> complaints re:  respiratory distress @ rest, w/o info. re.
> chest auscultation, spirometry, or saturation on room air.
> He notes "abnormalities of blood work"—these are not,
> inherently, preclusive of work capacity.  He notes muscle
> spasms-does not specify location, frequency, duration,
> intensity.

(A.R. at 92, 2-3-97 Nurse Girardo Comments.)   UNUM subsequently informed Epps-Malloy that the additional information furnished by her was "not sufficient to reverse [its] previous decision." (Id. at 91, 2-4-97 Letter from Dukes ("Den. Letter").)   Epps-Malloy's file was then forwarded to UNUM's Quality Review Section for "an impartial review as provided under ERISA."  (Id.)

13

In connection with this review, UNUM requested, at Merck's direction, that Epps-Malloy undergo an Independent Medical Examination ("IME") by pulmonologist Dr. Gautam Dev ("Dr. Dev"). (Dukes Aff. at ¶¶ 28-29; A.R. at 87, 2-5-97 Letter from Dukes.)[11] Dr. Dev's engagement letter specifically stated that Epps-Malloy was disabled "due to Sarcoidosis and shortness of breath" and asked him to determine "[h]ow much activity she [could] tolerate" and whether she could "perform any occupation." (A.R. at 66-67, 3-31-97 Letter from Jan Isenberg.) After examining Epps-Malloy, Dr. Dev stated in full:

> I saw Celeslie Epps-Malloy on 5/8/97. The patient is a 47 year old female with a history of sarcoidosis reportedly diagnosed by a transbronchial biopsy in 1987. The patient currently presents for medical evaluation for her complaints of shortness of breath on minimal exertion and also complains of cough, which is non-productive and is worse upon laying down. The patient also has post-nasal drip and chronic sinus problems. Her exercise tolerance is minimal and she is barely able to achieve her day-to-day activities. The patient was treated in the past with steroids; however, could not tolerate them because of what appears to be psychosis and marked degree of weight gain. She has a history of smoking one pack per day for six years. Her physical exam showed stable vitals and no adenopathy in the head and neck area. No jugular venous problems. Her chest was clear to auscultation and cardiac exam showed a normal S-1, S-2 without any murmur or gallop. Her abdomen was soft and non-tender. No hepatosplenomegaly felt. Bowel sounds were active. Extremities did not show any edema or rash. Her joints did not reveal any tenderness or limitation of motion. Neurologically, the patient was alert and oriented

---

[11] Though Dukes originally requested a rheumatologist, IME coordinator Jan Isenberg recommended a pulmonologist be used instead. (A.R. at 83.)

without any focal motor sensory deficit.  Her musculo-
skeletal exam was unremarkable.

Her pulmonary function tests were within normal limits.
Her arterial blood gas at rest on room air showed a pH
of 7.40, p002 32.8, p02 of 86.

My impression of Mrs. Epps-Malloy is that her
symptomatology is not commensurate with her clinical
presentation.  Considering the normal pulmonary
function test and near normal arterial blood gas, I
have a difficult time ascribing sarcoidosis as a cause
of her symptomatology.  She appears to be somewhat
emotional and I cannot reliably exclude her malingering
behavior.  On the contrary, the endobronchial sarcoid
may be leading to persistent cough and dyspnea.
Chronic sinusitis can also exacerbate a respiratory
condition and lead to some degree of shortness of
breath.  The patient's impaired cardiac status is also
a possibility and an exercise stress test might be able
to help answer some of the unanswered questions.

I feel, based on her pulmonary function tests and
arterial blood gas information, that her present
diagnosis is incompatible with her clinical
presentation.

(A.R. at 30, 5-19-97 Dr. Dev Report.)

Based on Dr. Dev's examination and other documentation in

her record, UNUM upheld its decision to terminate Epps-Malloy's

benefits.  (Dukes Aff. at ¶ 30.)  UNUM informed her by letter,

dated June 4, 1997, as follows:

We have received the report from Gautam Dev, MD.  The report
dated 5/18/97 indicates Dr. Dev performed a Pulmonary
Functions test and a [sic] arterial study (blood gas).  The
results of these exams were normal.  Therefore, your claim
will remain terminated.

(A.R. at 21, 6-4-97 Letter from Dukes ("Final Term. Letter").)

## PROCEDURAL HISTORY

Epps-Malloy instituted this action to recover benefits she claims she was entitled to under the Plan, asserting that she was and continues to be completely disabled.  (Dkt. entry no. 1, Compl.)  She asserted causes of action based on alleged violations of 29 U.S.C. § 1132(a)(1)(B), inter alia, the unlawful denial of benefits owed under the Plan and the unlawful termination of these benefits through arbitrary, capricious, and inconsistent Plan administration.[12]  (Dkt. entry no. 15, Second Am. Compl.)  Defendants' Answer included a counterclaim for an overpayment of benefits arising out of the failure to offset or reduce her payments to reflect SSD payments.  (Dkt. entry no. 16, Ans. & Counterclaim at ¶¶ 1-4.)

The Court granted in part and denied in part defendants' first motion for summary judgment, finding a right to restitution of any overpayments, but declining to determine the amount. (Dkt. entry no. 28, 7-17-00 Mem. & Order at 20.)  The Court found there were genuine issues of material fact regarding whether UNUM acted arbitrarily and capriciously when it terminated Epps-Malloy's LTD benefits.  (Id. at 16, 20.)  The Court then directed the parties to submit briefs in lieu of a formal bench trial. Applying a traditional arbitrary and capricious standard of

---

[12] In 2000, the Court dismissed this action as to plaintiff, Michaleen Kosiba, without prejudice.  (Dkt. entry no. 22, 3-16-00 Order.)

16

review, the Court determined that Defendants did not improperly terminate Epps-Malloy's LTD benefits.  (Dkt. entry no. 33, 12-27-01 Mem. Op. at 31, 35.)

Epps-Malloy appealed, and the Third Circuit Court of Appeals set aside the Court's decision and remanded for a new trial, holding that heightened review was required in this instance because of procedural bias present in UNUM's appeals process. Kosiba v. Merck & Co., 384 F.3d 58, 67-68 (3d Cir. 2004).  The Third Circuit also noted that even if the appropriate standard of review had been applied, the Court's decision on the merits was inadequate because it did not sufficiently "address the defendants' denial of LTD benefits to Epps-Malloy in light of her diagnosis of fibromyalgia."  Id. at 68.  Rather, because "her doctors ascribe[d] aspects of her disability to fibromyalgia," because the ALJ "appears to have granted SSA benefits" principally on the basis of fibromyalgia, and because pulmonologist Dr. Dev's report did not address fibromyalgia (a rheumatic disorder), the Third Circuit ordered the Court to separately consider Epps-Malloy's fibromyalgia from her sarcoidosis.  Id. at 68-69.[13]  The Supreme Court denied

---

[13] We are aware that although we "may take further evidence" to aid our understanding of the medical issues, our review "must base its ultimate determination on the record before the plan administrator" and "if there is not sufficient evidence in the defendants' records to support their decision as to the fibromyalgia claim, then it must be reversed."  Id. at 69.

defendants' petition for writ of certiorari.  (Dkt. entry no. 46, 5-23-05 Letter from Supreme Court.)

The parties entered into a period of unsuccessful settlement negotiations in 2006 and 2007.  (See, e.g., dkt. entry no. 51, 10-9-06 Letter from R. Matthew Pettigrew, Jr.)  Trial briefs were submitted on September 7, 2007, followed apparently by more settlement discussions.  (Dkt. entry nos. 59 & 60; see also 7-30-2008 ECF notation between dkt. entry nos. 61 & 62.)  But the Supreme Court subsequently decided Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), eliminating the Third Circuit's heightened arbitrary and capricious standard.  During a telephone status conference, it was determined that the parties would submit cross-motions for summary judgment, addressing the issue in light of Glenn.  (Dkt. entry no. 63, Conf. Min; dkt. entry no. 64; Pl. Mot. S.J.; dkt. entry no. 65, Def. Mot. S.J.)

The Court now considers these motions, deciding whether Defendants' termination of Epps-Malloy's LTD benefits was arbitrary and capricious.

**DISCUSSION**

I.  **Summary Judgment Standard**

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a

18

matter of law.  Fed.R.Civ.P. 56(a).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  <u>United States ex rel. Josenske v. Carlisle HMA, Inc.</u>, 554 F.3d 88, 94 (3d Cir. 2009) (citing <u>Abramson v. William Patterson Coll.</u>, 260 F.3d 265, 276 (3d Cir. 2001)).

## II.  ERISA Standard of Review

A denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  Thus, where the plan gives the administrator discretion, the administrator's interpretation of the plan "will not be dismissed if reasonable." <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 437 (3d Cir. 1997) (quoting <u>Firestone</u>, 489 U.S. at 111).  In other words, when a plan administrator has discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and capricious standard. <u>See</u> <u>Stoetzner v. U.S. Steel Corp.</u>, 897 F.2d 115, 119 (3d Cir. 1990) (application of deferential arbitrary standard of review appropriate when benefit plan gave administrator discretion to

determine eligibility); see also Miller v. Metro. Life Ins. Co.,
925 F.2d 979, 983 (6th Cir. 1991) (same).

A plan administrator's decision is arbitrary and capricious
if it is "without reason, unsupported by substantial evidence or
erroneous as a matter of law." Abnathya v. Hoffman-La Roche,
Inc., 2 F.3d 40, 45 (3d Cir. 1993); Kao v. Aetna Life Ins. Co.,
647 F.Supp.2d 397, 410 (D.N.J. 2009).  "This scope of review is
narrow, and the Court is not free to substitute its own judgment
for that of the defendants in determining eligibility for plan
benefits." Abnathya, 2 F.3d at 45.  Although the arbitrary and
capricious standard is extremely deferential, "[i]t is not ...
without some teeth." Moskalski v. Bayer Corp., No. 06-568, 2008
WL 2096892, at *4 (W.D. Pa. May 16, 2008).  "Deferential review
is not no review, and deference need not be abject." Id.
(citation omitted).  Substantial evidence requires more than a
"mere scintilla" of evidence. Id. at *4 n.3.[14]

In determining whether a benefits termination was arbitrary
and capricious, we review "various procedural factors underlying
the administrator's decision-making process, as well as
structural concerns regarding how the particular ERISA plan was
funded." Miller v. Am. Airlines, Inc., No. 08-277, 2011 WL

---

[14] In the ERISA context, the abuse of discretion and
arbitrary and capricious standards of review are "practically
identical" and cases often use the terms interchangeably. Estate
of Schwing v. The Lilly Health Plan, 562 F.3d 522, 526 n.2 (3d
Cir. 2009) (citing Abnathya, 2 F.3d at 45 n.4).

208291, at *4 (3d Cir. Jan. 25, 2011).  "If a benefit plan gives
discretion to an administrator or fiduciary who is operating
under a conflict of interest, that conflict must be weighed as a
factor in determining whether there is an abuse of discretion."
Firestone, 489 U.S. at 115; see Kosiba, 384 F.3d at 64.  A
conflict of interest can be created, for example, when an
employer both funds and evaluates employee claims.  Glenn, 554
U.S. at 105.  A conflict of interest can also be created if an
employer "pay[s] an independent insurance company to fund,
interpret and administer a plan."  Pinto v. Reliance Standard
Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000) rev'd on other
grounds, Glenn, 554 U.S. at 114.

     In response to Glenn, the Third Circuit abandoned its
"sliding scale" approach to ascertaining the amount of discretion
afforded decisions of plan administrators.  Schwing, 562 F.3d at
525-26.  Post-Glenn, the governing standard requires the
plaintiff to show that the denial of benefits was arbitrary and
capricious, with a conflict of interest as simply one factor for
the court's consideration.  Id. at 526.  The weight to be
accorded this structural conflict is another matter.  Grimes v.
Prudential Fin., Inc., No. 09-419, 2010 WL 2667424, at *13
(D.N.J. June 29, 2010).  The conflict may "act as a tiebreaker
when the other factors are closely balanced," and its importance
will increase "where circumstances suggest a higher likelihood

21

that it affected the benefits decision . . . ." <u>Glenn</u>, 554 U.S.
at 117.  Conflicts are most pertinent, for example, "where an
insurance company administrator has a history of biased claims
administration," or where an insurer fails to provide its
independent experts with all relevant evidence upon which to base
their reports.  <u>Id.</u> at 117-18.

Whereas "[t]he structural inquiry focuses on the financial
incentives created by the way the plan is organized . . . the
procedural inquiry focuses on how the administrator treated the
particular claimant." <u>Post v. Hartford Ins. Co.</u>, 501 F.3d 154,
162 (3d Cir. 2007).  Specifically, in considering the process the
administrator used to deny benefits, courts consider numerous
"irregularities" to determine "whether, in this claimant's case,
the administrator has given the court reason to doubt its
fiduciary neutrality." <u>See</u> <u>id.</u> at 165 (internal citations
omitted).  Ultimately, the Court "determine[s] lawfulness by
taking account of several different, often case-specific,
factors, reaching a result by weighing all together." <u>Glenn</u>, 554
U.S. at 117.

A number of procedural anomalies can lead to a finding of
arbitrary and capricious termination, <u>inter</u> <u>alia:</u> (1) a reversal
of a benefits determination without additional evidence, (2) a
disregard of opinions previously relied upon, (3) a self-serving
selectivity in the use of evidence or reliance on self-serving

22

paper reviews of medical files, (4) a reliance on the opinions of non-treating physicians over treating physicians without explanation, (5) a reliance on inadequate information or incomplete investigation, (6) failure to comply with the notice requirements of Section 504 of ERISA, (7) failure to analyze all relevant diagnoses, and (8) failure to consider plaintiff's ability to perform actual job requirements.  See Miller, 2011 WL 208291, at *7, *8-10, *12, *14;[15] Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F.Supp.2d 261, 287 (W.D. Pa. 2008) (internal quotations and citations omitted).[16]

## III. Analysis

Epps-Malloy argues, inter alia, that (1) the conflict of interest is a factor to be considered (Pl. Rep. at 2), (2) Defendants ignored salient portions of the record, for example that Dr. Dev did not address Epps-Malloy's history of fibromyalgia (id. at 3), (3) Nurse Girardo's opinion should not have been relied upon (Pl. Mot. S.J. at 19), and (4) her SSA

---

[15] The Court previously declined to consider whether Epps-Malloy's termination letters were inadequate (12-27-01 Mem. Op.), but we observe that, as in Miller, they state "a bare conclusion" of non-disability that does not "provide a specific reason for the termination decision" but rather provide "a general blanket assessment that [she was] ineligible for disability benefits." Miller, 2011 WL 208291, at *11.  Because it is unnecessary given the other factors, we make no further determination on the issue.

[16] Although Lamanna applied the "sliding-scale" approach to determining whether to apply heightened scrutiny, its evaluation of the administrator's actions are still helpful for our task of identifying and weighing procedural factors.

disability determination was improperly ignored (Pl. Mot. S.J. at 13).  Defendants argue that under a deferential arbitrary and capricious standard, their decision to terminate benefits was proper.  Defendants argue that the Court's previous determination regarding sarcoidosis should not be disturbed and that it should find the same regarding fibromyalgia because "there is no evidence to support a claim of total disability . . . due to fibromyalgia.  (Def. Mot. S.J. at 7.)

While the Third Circuit's heightened scrutiny is no longer applicable, its mandate to consider the evidence of procedural bias in Epps-Malloy's benefits termination and appeals process still holds.  Kosiba, 384 F.3d at 68-69.  While the administrative record may not unassailably demonstrate disability, it also "does not contain 'an abundance of evidence' of ineligibility such that we should ignore any procedural defects in the termination decision."  Miller, 2011 WL 208291, at *6 (citing Schwing, 562 F.3d at 526).  Thus, following Kosiba and Miller, the Court will consider and weigh the various, case-specific factors here, including the alleged financial conflict of interest and asserted procedural irregularities, in determining whether Defendants acted appropriately in terminating Epps-Malloy's LTD benefits.  See Miller, 2011 WL 208291, at *19 n.3; Schwing, 562 F.3d at 525.

24

## A. Analysis of All Relevant Diagnoses - Fibromyalgia

The Third Circuit Court of Appeals instructed the Court to "adequately address the defendants' treatment of Epps-Malloy's fibromyalgia diagnosis." Kosiba, 384 F.3d at 68. "An administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is also a cause for concern that suggests the decision may have been arbitrary and capricious." Miller, 2011 WL 208291, at *12. "It follows that if a reviewing court errs by failing to address a plaintiff's multiple conditions, the court should give little deference to a plan administrator's decision which also fails to take multiple conditions into account." Lamanna, 546 F.Supp.2d at 298.

"It is well-established in ERISA and [SSD] cases that fibromyalgia and chronic fatigue syndrome are both conditions for which objective clinical tests such as blood or other laboratory tests, x-rays, and MRIs, do not exist." Id. at 299; see also Brown v. Cont'l Cas. Co., 348 F.Supp.2d 358, 369 (E.D. Pa. 2004) (even if an ERISA administrator may impose a requirement for "objective" medical evidence that does not appear explicitly in a plan's terms, it would be unreasonable to do so in the case of a fibromyalgia patient because such a requirement would effectively preclude any such patient from qualifying as totally disabled). Even outside the fibromyalgia context, the court in Grimes vacated the defendant's termination decision where the record was

"devoid of evidence" that it had considered one of the plaintiff's documented limitations.  2010 WL 2667424, at *15.

Here, UNUM did not once mention Epps-Malloy's fibromyalgia diagnosis in its termination materials (see A.R. at 120, 91, 87, 21), even though her doctors and the SSA ascribed "aspects of her disability" to the condition.  <u>Kosiba</u>, 384 F.3d at 68.  During the review of Epps-Malloy's claim in 1996, while UNUM asked Dr. Williams about Epps-Malloy's sarcoidosis diagnosis, it failed to address fibromyalgia, even in the face of his notes from January 1996, indicating her diagnosis of fibromyositis and fibromyalgia. (A.R. at 128, 10-28-96 Dr. Williams Report; A.R. 189, 1-16-96 Dr. Williams Notes.)  Moreover, in its response to Epps-Malloy's subsequent letters, UNUM did not address her and Dr. McQueen's assertions regarding her fibromysitis or fibromyalgia diagnoses. (A.R. at 116, 94.)

Defendants argue Dr. Dev did provide evidence regarding fibromyalgia, in that his musculoskeletal examination was "unremarkable."  (Dkt. entry no. 70, Def. Opp'n at 6.)  But (1) Dr. Dev is not a rheumatologist, (2) he did not logically tie his examination to fibromyalgia or use it to counter her diagnosis of fibromyalgia, (3) this argument ignores the fact that fibromyalgia does not always manifest itself in objective ways, and (4) Dr. Dev did not address whether Epps-Malloy was capable of performing any task as a <u>result</u> of her fibromyalgia.  <u>See</u>

26

<u>Lamanna</u>, 546 F.Supp.2d at 296.  Alternatively, Defendants suggest
that fibromyalgia was not addressed because her doctors "either
did not diagnose her with this condition, or merely mentioned it
. . . without any diagnostic testing."  (Def. Opp'n at 7.)  This
represents a failure to consider the record as a whole.  Although
the prior LTD benefits award letters do not specify on what
conditions the decisions were based (<u>see, e.g.</u>, A.R. at 235), the
pre-1995 record is replete with references to fibromyalgia, for
example, Dr. Stein's October 1994 report provided in response to
Defendants' first review of her 1993 "any-occupation" LTD
benefits.  (A.R. at 204, 10-26-94 Dr. Stein Report.)  Moreover,
Dr. Williams simply answered UNUM's questionnaire, which only
asked about sarcoidosis, and Dr. Pannullo was a gynecologist who
would not have diagnosed Epps-Malloy with fibromyalgia.  (A.R. at
128, 10-28-96 Dr. Williams Report.)

Defendants' citation of <u>Yeager v. Reliance Standard Life
Ins. Co.</u>, 88 F.3d 376, 381-82 (6th Cir. 1996), is distinguishable
because there the plaintiff never had a definitive diagnosis of
fibromyalgia, whereas here, Epps-Malloy had such a diagnosis, got
SSD benefits, and received Defendants' approval for LTD benefits,
at least in part because of it.  (Def. Tr. Br. at 31.)  Thus,
this omission of discussion of fibromyalgia from the termination
process counsels towards finding that Defendants' decision was
arbitrary and capricious.  See <u>Miller</u>, 2011 WL 208291, at *13.

## B. Selective Consideration of Medical History and Opinions

"An administrator may not selectively consider and credit medical opinions without articulating its thought processes for doing so." Ricca v. Prudential Ins. Co. of Am., No. 08-257, 2010 WL 3855254, at *7 (E.D. Pa. Sept. 30, 2010). The Supreme Court in Glenn approved of the Sixth Circuit's determination that a denial was arbitrary where a plan selectively considered evidence to reach a decision unsupported by the record as a whole, emphasizing a certain medical report that favored denial and "deemphasiz[ing] certain other reports that suggested a contrary conclusion." Glenn, 554 U.S. at 118. The Seventh Circuit has also held that "selective readings" of the evidence that are "not reasonably consistent with the entire picture" is "another hallmark of an arbitrary and capricious decision." Holmstrom v. Metro. Life Ins. Co., 615 F.3d 758, 777 (7th Cir. 2010) (citing Majeski v. Metro. Life Ins. Co., 590 F.3d 478, 483-84 (7th Cir. 2009) (denial decision arbitrary where insurer selectively relied on pieces of evidence to support denial of benefits, while that evidence in context demonstrated disability) and Leger v. Tribune Co. Long Term Disability Benefit Plan, 557 F.3d 823, 832-33 (7th Cir. 2009) (denial decision arbitrary where insurer "cherry-picked the statements from her medical history that supported the decision to terminate her benefits, while ignoring a wealth of evidence to support her claim that she was totally disabled")).

28

In its initial termination letter here, Defendants cherry-picked helpful portions of the questionnaires from Drs. Pannullo and Williams.  (A.R. at 120, Init. Term. Letter.)  It cited Dr. Pannullo's return-to-work prognosis as "good" while ignoring the observation that she only treated Epps-Malloy for gynecological issues.  (A.R. at 145, 9-10-96 Dr. Pannullo Report).  It cited Dr. Williams's comment that Epps-Malloy could "perform light duty" while failing to mention or explain why it ignored the further contention that she was still disabled and unable to return to work.  (A.R. at 128, 10-28-96 Dr. Williams Report.) The termination letter further states that "the medical documentation received to date" provided "no evidence to support that you are medically unable to perform the duties of your occupation."  (A.R. at 120.)  Leaving aside the fact that this was an "any-occupation" LTD benefit claim and not an "own-occupation" claim (calling into question the care given to this review), this statement demonstrates that Epps-Malloy's entire medical history was ignored, without explanation.

Epps-Malloy next submitted to Defendants her records from Dr. McQueen, which Defendants also cursorily dismissed, noting that the additional information was simply "not sufficient to reverse our previous decision."  (A.R. at 91, Den. Letter.) Morever, Nurse Girardo's review of the information merely pointed out lack of objective evidence and noted that "abnormalities of

blood work" are not "inherently preclusive of work capacity" -
without any reference to what kind of work.  (A.R. at 92, Nurse
Girardo Report.)  <u>See</u> <u>Lamanna</u>, 546 F.Supp.2d at 294 ("[w]e cannot
agree that [independent medical file reviewers] simply
summarizing another physician's findings is the same as
'specifically discussing' why they disagree.").

Defendants next ordered an IME from Dr. Dev and relied on it
in finally terminating LTD benefits.  (A.R. at 21, Final Term.
Letter.)[17]  "[C]ourts have no warrant to require administrators
automatically to accord special weight to the opinions of a
claimant's physician; nor may courts impose on plan
administrators a discrete burden of explanation when they credit
reliable evidence that conflicts with a treating physician's
evaluation."  <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S.
822, 834 (2003).  However, "Plan administrators . . . may not
arbitrarily refuse to credit a claimant's reliable evidence,
including the opinions of a treating physician."  <u>Id.</u>

The Court finds nothing inherently wrong with Defendants
seeking further evidence on the record before them and crediting
Dr. Dev over Drs. Williams and McQueen.  But Defendants cited

---

[17] Though perhaps, as the Third Circuit suggests, the IME
was ordered to "counter Epps-Malloy's physicians' evaluation,"
further evidence was not submitted on this point, and the
Administrative Record merely reveals that "Unum rec'd a call from
Pat Switzer @ Merck.  They request IME because of union."  (A.R.
at 12, 2-6-97 File Note.)

reliance on Dr. Dev's opinion simply because Epps-Malloy's tests were "normal." (A.R. at 21, Final Term. Letter.)  The letter does not explain why it credited this opinion over her treating physicians, or attempt to reconcile that Dr. Dev disagreed with her sarcoidosis diagnosis while at the same time conceding it was a possible source of her symptoms. (Id.; A.R. at 30, Dr. Dev Report ("On the contrary, the endobronchial sarcoid may be leading to persistent cough and dyspnea.").)  Dr. Dev also did not comment on Epps-Malloy's ability to return to work, despite being instructed to assess this. (A.R. at 67, 3-31-97 Dr. Dev. Engagement Letter.)  Thus, Defendants failed to logically connect Dr. Dev's normal test findings with Epps-Malloy's purported ability to return to work. See Dunn v Reed Grp., Inc., No. 08-1632, 2009 WL 2848662, at *14 (D.N.J. Sept. 2, 2009) (where the "mere conclusion" that plaintiff was capable of sedentary work was "a bald assertion without a proper explanation."). Compare Wernicki-Stevens v. Reliance Standard Life Ins. Co., 641 F.Supp.2d 418, 425 (E.D. Pa. 2009) (where plaintiff may disagree, but there was little to suggest that defendant's decision to credit an FCA was without reason).[18]  The Court will weigh this selective consideration of the medical evidence accordingly.

_____

[18] The same, presumably, would apply to crediting an IME, but here Dr. Dev's IME did not definitively rule out sarcoidosis, address fibromyalgia, or discuss whether Epps-Malloy had the functional capabilities to perform any occupation.

### C. Functional Capacity to Perform Job Requirements

"[I]t is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually preform the specific job requirements of a position." Miller, 2011 WL 208291, at *14.  In Miller, the court determined that Defendants' doctors failed to adequately address whether Miller could perform his job as a pilot, which suggested the termination was not "reasoned and based on an individualized assessment of Miller's ability," and thus was an arbitrary and capricious decision.  Id. at *15.  While the Court here is faced with an "any-occupation" standard, as opposed to an "own-occupation" standard, Miller cited Lamanna in its endorsement of a "reasoned decision" requirement.  Id. at *14.  In Lamanna, the court disapproved of defendants' failure to demonstrate objective evidence of plaintiff's ability to return to work in a termination of "any-occupation" LTD benefits.  546 F.Supp.2d at 296-97.

Even where a vocational analysis is not a requirement of a claim determination under a plan, a "Defendant is still obligated under ERISA to provide a well-reasoned explanation of its decision including which sedentary jobs Plaintiff is capable of working, with or without accommodations." Dunn, 2009 WL 2848662, at *11 (citing Havens v. Cont'l Cas., Co., 186 Fed.Appx. 207, 212-13 (3d Cir. 2006)).  "While a plan administrator is under no

32

obligation to conduct a 'full-blown vocational evaluation' of a claimant's job, it must make a reasonable inquiry into the types of skills a claimant possesses and whether those skills are transferable to another occupation." Lamanna, 546 F.Supp.2d at 296 (citing Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 476 (7th Cir. 1998)). In Dunn, the administrator's "mere conclusion" that plaintiff was capable of sedentary work was "a bald assertion without a proper explanation." 2009 WL 2848662, at *13. In addition, "[w]hile the amount of fatigue or pain an individual experiences may be entirely subjective, the extent to which those conditions limit her functional capabilities can be objectively measured." Lamanna, 546 F.Supp.2d at 296 (citing Williams v. Aetna Life Ins. Co., 509 F.3d 317, 323 (7th Cir. 2007); Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 16, n. 5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.")). In Lamanna, the court found the administrator's conclusion that plaintiff was "capable of engaging in gainful employment" arbitrary and capricious because three different IMEs disagreed on her ability to return to work, there was no formal job description in the record, and there was no additional

evidence in the record regarding her functional capacity or the effect of her symptoms on her ability to work.  Id. at 295-96.

Defendants, similarly, provided no explanation of what job Epps-Malloy could supposedly do or why.  UNUM referred to "your occupation," which was incorrect at this "any-occupation" stage, but in any case failed to describe the requirements of any job and improperly interpreted the comments of Drs. Williams and Pannullo to support her return to work.  (A.R. at 120, Init. Term. Letter.)  Moreover, even though Dukes stated that Epps-Malloy could perform "light duty," which might more correctly correspond to the "any-occupation" standard, the termination letter contains no discussion of what jobs might encompass "light duty," what the physical requirements of said jobs might be, or what objective evidence in the record supported that determination.  (Id.)

Dr. Dev also failed to address, as requested, Epps-Malloy's medical record or her ability to work.  (A.R. at 30, Dr. Dev Report.)  Even if Dr. Dev was correct that Epps-Malloy was malingering with respect to her claims of sarcoidosis, there was little, if anything, to contradict her previous diagnoses of fibromyalgia or her previous FCA, both of which Defendants accepted as evidence of total disability in 1994.  (A.R. at 306,

34

Couwenberg Report.)[19]  Though not required in all cases, the
absence of any new functional capacity data here leads the Court
to view skeptically Defendants' conclusion that Epps-Malloy could
return to work.[20]  See Lamanna, 546 F.Supp.2d at 296-97 ("It
logically follows that [the administrator's] decision could not
rest on reasoned judgment where [consulting doctors] offered only
unfounded generalizations or speculation about Ms. Lamanna's
ability to perform work-related tasks and there is no evidence
[the administrator] itself performed any type of work analysis
vis-a-vis her medical limitations.") (citing Elliott v. Metro.
Life Ins. Co., 473 F.3d 613, 618 (6th Cir. 2006) ("medical data,

---

[19] Defendants argue Dr. Dev did perform a musculoskeletal
exam, but this is an after-the-fact justification, given that
neither Dukes nor Dr. Dev mention fibromyalgia in their
correspondence.  Although not addressed by the parties, there
appears to be some question as to the appropriate level of
deference to post hoc rationales offered to justify a benefits
denial or termination.  Many of the arguments made by defendants
were not explicitly stated in its correspondence with Epps-
Malloy.  The Third Circuit has expressed significant concern
regarding these kinds of justifications offered "for the first
time in federal court."  Skretvedt v. E.I. DuPont de Nemours &
Co., 268 F.3d 167, 177 n.8 (3d Cir. 2001).

[20] Though the initial termination letter suggests providing
objective medical evidence, this is difficult in the case of
fibromyalgia, and nowhere in any termination letter does UNUM
suggest that Epps-Malloy obtain an FCA herself to objectively
demonstrate the effect of her disabilities.  See Miller, 2011 WL
208291, at *12; Lamanna, 546 F.Supp.2d at 296 ("[I]t seems
unreasonable that in a period of approximately six years, [no
one] suggested that she undergo an FCA or some other method to
objectively measure her physical abilities.").

without reasoning, cannot produce a logical judgment about a claimant's work ability.")).  This factor will be weighed accordingly.

**D. Reversal of Prior Any-Occupation LTD Benefits Decision**

"An administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion."  <u>Miller</u>, 2011 WL 208291, at *7; <u>see also</u> <u>McOsker v. Paul Revere Life Ins. Co.</u>, 279 F.3d 586, 589 (8th Cir. 2002) (reversal of position supported arbitrary and capricious finding where information used to terminate benefits did not "vary significantly from the [previous] opinions").  In <u>Miller</u>, the Third Circuit found that plaintiff's doctors' more recent reports did not provide any new information, and so the reversal was suspect.  <u>Id.</u> at *8.  A reversal can be proper however, where, as in <u>Curry v. Eaton Corp.</u>, Nos. 08-5973, 08-6369, 2010 WL 3736277, at *3-4 (6th Cir. Sept. 20, 2010), the plan reversed its prior decision of any-occupation LTD benefits, but had obtained numerous IMEs and an FCA review.  The court there additionally found no abuse of discretion in the denial of benefits because plaintiff's SSD had been obtained many years before the new determination, and because the termination letter was thorough, well-reasoned, and explained its reasons for not crediting the treating physicians.

36

Id.; see also Hoch v. Hartford Life & Acc. Ins. Co., No. 08-4805, 2009 WL 1162823, at *17 (E.D. Pa. Apr. 29, 2009) (where "the reversal occurred when the test changed from 'own-occupation' to 'any-occupation'").

Defendants' initial reversal on December 31, 1996 was made after an "any-occupation" determination of disability had already been made and upheld once, so Hoch is not particularly relevant. The decision was made with very little new information.  Dr. Pannullo's report does not provide any information, because she is a gynecologist, not a pulmonologist or rheumatologist, and she specifically said she was not treating Epps-Malloy for any illness.  (A.R. at 145, 9-10-96 Dr. Pannullo Report.)  Dr. Williams gave essentially the same information as was on the record before: disabled to light activity, shortness of breath, and a prognosis of never returning to gainful employment.  (A.R. at 128, 10-28-96 Dr. Williams Report.)

Dr. McQueen's medical report, obtained in January 1997, echoes Epps-Malloy's previous doctors, in that he stated she had "severe sarcoidosis" and fibromyositis and was totally disabled by her condition.  (A.R. at 94, Dr. McQueen Notes.)  He noted skin lesions on her legs and gave her steroid cream.  (Id.)  He opined that her sarcoidosis is in remission and might be triggered by stress, a feeling with which she could not cope. (Id.)  Nurse Girardo opined that the ailments listed in Dr.

37

McQueen's notes include some subjective complaints and objective tests that are "not, inherently, preclusive of work capacity," but she does not provide any new information to conclude that Epps-Malloy had actual work capacity.  (A.R. at 92, Nurse Girardo Comments.)

Defendants' subsequent appeal decision did, however, rely on some new medical information that varied from Epps-Malloy's historical record, in the IME performed by Dr. Dev.  (A.R. at 30, Dr. Dev Report.)  This new information may be more substantial than that provided in Miller, where (1) the IME report was only a paper review and not a physical exam, (2) Miller's medical opinions came from the same treating doctor who saw him over a period of years, and (3) the plan called for termination if "verification of such Disability can no longer be established." Miller, 2011 WL 208291, at *1, *6, *8.  But the Miller court's section on reversal rests on the plan's determination before obtaining an IME; similarly here there was certainly no materially different evidence to support denial before Dr. Dev's physical examination.  See id. at *7-8.  The Miller court also noted that the IME did not discuss Miller's anxiety diagnosis, much like here, where Dr. Dev's opinion does not discuss fibromyalgia.  (A.R. at 30, Dr. Dev Report.) Miller, 2011 WL 208291, at *12; see also id. at *13 (where, as here, rather than requesting clarification, defendants "accepted the [independent

38

examiner] report as provided in ultimately terminating Miller's LTD benefits.  Although we recognize [defendant need not credit treating physician], we are skeptical of [defendants'] exclusive reliance on the conclusions in the [independent examiner's] report . . . when the report neglects to substantively analyze Miller's anxiety diagnosis").

The Court here is skeptical of Defendants' reliance on a report that does not substantively analyze Epps-Malloy's fibromyalgia diagnosis.  While an administrator's initial payment of benefits "does not operate as an estoppel such that they can never terminate benefits . . . in the absence of any meaningful evidence to support a change in position" an "abrupt reversal is cause for concern that weighs in favor of finding that its termination decision was arbitrary and capricious." Id. at *8. Here, in the absence of meaningful new evidence, initially at all and on Epps-Malloy's fibromyalgia condition during the appeal, Defendants' reversal of LTD benefits weighs in favor of finding its termination decision was arbitrary and capricious.[21]

**E. Social Security Disability Benefits**

The Third Circuit Court of Appeals expressed "no view on the relevance vel non in the ERISA benefits context of an SSA finding

---

[21] The Court also considers that "the circumstances under which Merck made this request [for an IME] necessarily raise an inference of bias: At the time of the request, every piece of evidence in Epps-Malloy's record . . . supported her contention that she was disabled." Kosiba, 384 F.3d at 67.

of total disability," but it noted "the SSA ruling gives at least some support for Epps-Malloy's claim for ERISA benefits." Kosiba, 384 F.3d at 67 n.6.  "[I]t is well-established that a Social Security award in itself does not indicate that an administrator's decision was arbitrary and capricious."  Houser v. Alcoa, Inc. Long Term Disability Plan, No. 10-160, 2010 WL 5058310, at *14 (W.D. Pa. Dec. 6, 2010).  "The legal principles controlling the Social Security analysis differ from those governing the ERISA analysis, and, thus, the [SSA's] determination of 'disability' is not binding on an ERISA benefit plan."  Id. (citing Burk v. Broadspire Servs., Inc., 342 Fed.Appx. 732, 738 (3d Cir. 2009) (failure to consider award of SSD benefits not abuse of discretion); Pokol v. E.I. Du Pont De Nemours & Co., 963 F.Supp. 1361, 1380 (D.N.J. 1997) ("[I]t is not inherently contradictory to permit an individual to recover benefits pursuant to the Social Security Act while being denied benefits pursuant to a private ERISA benefit plan."); Krensavage v. Bayer Corp., No. 04-1476, 2006 WL 2794562, at *9 (W.D. Pa. Sept. 27, 2006) ("[C]ourts have consistently held that ERISA plan administrators are not bound to follow [SSD] determinations.")).

Courts have not, however, declared that an SSA disability determination has no bearing on ERISA decisions.  "The SSA's decision may be considered as a factor in evaluating whether a plan administrator has acted arbitrarily and capriciously in

reviewing a plaintiff's claim."  Marciniak v. Prudential Fin.
Ins. Co. of Am., 184 Fed.Appx. 266, 269 (3d Cir. 2006).  For
example, the Supreme Court in Glenn, discussing the factors that
the Sixth Circuit considered below, noted that "[i]n particular,
the court found questionable the fact that MetLife had encouraged
Glenn to argue to the [SSA] that she could do not work, received
the bulk of the benefits . . . and then ignored the agency's
finding."  554 U.S. at 118.  This action was an important factor
in its own right, suggesting "procedural unreasonableness."  Id.;
see also Dunn, 2009 WL 2848662, at *19 (lack of explanation for
rejecting SSA determination was a procedural irregularity, which,
when added to the others, supported remand).

    "An administrator is not forever bound by a Social Security
determination of disability, but an administrator's failure to
consider the determination in making its own benefit decisions
suggests arbitrary decisionmaking."  Holmstrom, 615 F.3d at 772-
73.  "[I]f the plan administrator (1) encourages the applicant to
apply for [SSD] payments; (2) financially benefits from the
applicant's receipt of Social Security; and then (3) fails to
explain why it is taking a position different from the SSA on the
question of disability, the reviewing court should weigh this in
favor of a finding that the decision was arbitrary and
capricious."  Curry, 2010 WL 3736277, at *17 (citing Bennett v.
Kemper Nat'l Servs., Inc., 514 F.3d 547, 553 (6th Cir. 2008)).

But courts have found administrators' rejection of an SSD decision permissible in an ERISA termination context where, for example, the two definitions of disability differ, the SSA decision was made on differing medical evidence, or the two determinations were far apart in time.  See, e.g., Wernicki-Stevens, 641 F.Supp.2d 418 at 424 (not arbitrary and capricious to disregard SSA determination made six years earlier and on other medical evidence); Hoch, 2009 WL 1162823, at *17 (rejection of SSA determination was relevant but carried little if any weight, because made before much evidence was available in 2006, and because the definitions of disability were different).

As the Court stated in its previous opinion:

The Social Security Decision should be considered in our evaluation of UNUM's termination of benefits.  As Epps-Malloy notes, clear similarities exist between the Plan and the Social Security Act.  The Social Security Act defines a total disability as an "inability to engage in any substantial gainful activity," 42 U.S.C. § 423(d)(1)(A). The Plan defines such a term as "the inability of the participant to engage in any gainful employment for which the Participant is or may become reasonably qualified by training, education and experience." (Plan.) . . . The Plan also required Epps-Malloy to apply for these Social Security benefits.  (Plan.) . . . [T]he Court therefore concludes that the Social Security Decision is entitled to a certain degree of weight in our analysis.

(12-27-01 Mem. Op. at 51-52 (footnote omitted).)  Epps-Malloy's SSD application was rejected on December 14, 1992, but granted by the ALJ on September 13, 1994.  (A.R. at 281, 12-14-92 Social Security Denial; A.R. at 132, 9-13-94 Social Security Decision.) It is unclear upon what Defendants based the original "any-

occupation" LTD benefits award on October 4, 1993, but Defendants had notice by October 16, 1996, at the latest that Epps-Malloy was receiving SSD benefits.  (A.R. at 178, 10-16-96 File Note.) This was a full six weeks before determining she was no longer disabled.  Defendants also appears to have received the award letter with the findings by November 15, 1996: a note in the administrative record concludes " . . . he informed her she needed to send over the entire letter.  That then arrived Friday, 11/15/96."  (A.R. at 127, 11-20-96 File Note.)  Epps-Malloy claims to have sent her SSD letter earlier, and expressed frustration that Defendants made her apply for it, she sent it, and that Defendants seemed to have lost it with her other records.  (A.R. at 114, 1-8-97 Letter from Epps-Malloy ("I find it hard to understand that all of my records have been lost, as you stated to me.  And the fact that Unum has no record of me receiving [SSD] since 1994.  When it was mandatory for me to apply for S.S. under the [Plan].").)

Despite Defendants' possession of Epps-Malloy's SSD decision, the initial termination letter only mentioned her SSD benefits in connection with offsetting her LTD benefits payments. It did not explain why it disregarded the SSA decision.  The Court previously stated that "UNUM presumably gave this Social Security Decision some consideration given its inclusion in the administrative record" and "the weight to be given this Social

43

Security Decision must be reduced because these two reports [Nurse Girardo and Dr. Dev] were not before the [ALJ]." (12-27-01 Mem. Op. at 48, 53.) However, upon consideration of the recent case law discussed above, the Court will reconsider its weight. Here, SSD benefits were awarded within one year of Defendants' initial "any-occupation" LTD benefit award. The 1996 review and termination of Epps-Malloy's LTD benefits was only two years removed from this SSD decision. The medical information available during the 1996 review was not materially different from the information before the SSA. Although the reports of Dr. Dev and Nurse Girardo because available during the appeal process, as discussed above, Dr. Dev does not address fibromyalgia and Nurse Girardo's review was "irrelevant." Kosiba, 384 F.3d at 62.

This is not to say Defendants wholly ignored the SSD decision. The administrative record is replete with references to checking Epps-Malloy's SSD status, obtaining the amount of her SSD benefits, and beginning to offset her LTD benefits. When this was not done in a timely manner, UNUM noted that the "[claim] was extremely mis handled [sic]." (A.R. at 17, 10-16-96 File Note.) For these reasons, the Court will give some weight to Defendants' decision not to follow Epps-Malloy's SSD decision. See Glenn, 554 U.S. at 118; Dunn, 2009 WL 2848662, at *19.

44

### F. Financial Conflict of Interest

Where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115 (internal citation omitted).  A conflict emerges "where it is the employer that both funds the plan and evaluates the claims" because "[i]n such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'" Glenn, 554 U.S. at 112 (internal citation omitted).  As Miller recently discussed:

> Glenn instructs that a conflict arises where an employer both funds and evaluates claims.  The Supreme Court's broad view of whether a conflict of interest exists, therefore, encompasses an arrangement where an employer makes fixed contributions to a plan, evaluates claims, and pays claims through a trust.  Even in an actuarially grounded plan, the employer provides the monetary contribution and any money saved reduces the employer's projected benefit obligation. The Supreme Court did recognize, however, that a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances."

2011 WL 208291, at *6 (internal citations omitted).

When it previously examined the alleged conflict of interest under old Third Circuit precedent, the Court could not "say that the structural details at issue implicate[d] an inherent conflict of interest calling for such a higher standard of review."  (12-

27-01 Mem. Op. at 31.)  The Third Circuit also noted that "the record . . . does not demonstrate such a [financial] conflict." Kosiba, 384 F.3d at 68.  Despite the legal developments in Glenn and Miller, the Court has still "not been provided with specific information regarding the actual funding of the Plan by Merck." (12-27-01 Mem. Op. at 33.)  Defendants argue that the matter has been resolved, as both the Court and the Third Circuit "have previously found that the delegation by Merck of the claims administrative authority to [UNUM] removes any immediate financial conflict of interest."  (Def. Mot. S.J. at 6.)  Rather than provide additional evidence of a financial conflict, Epps-Malloy focuses on procedural biases and merely points to the Third Circuit's implication that "it appears Merck was looking for a reason to discontinue" her benefits.  (Pl. Tr. Br. at 10, 16; Pl. Mot. S.J. at 18; see Pl. Opp'n at 5-6.)  Thus, as a factor in the arbitrary and capricious determination, it will receive little weight.[22]

---

[22] The Court has some concern with notations in the record that imply Merck did not act as a wholly disinterested funder, namely that (1) ten days before UNUM sent the initial termination letter, Merck said it would "let UNUM decide" the claim (A.R. at 13.), (2) UNUM consulted with Merck on the claim (A.R. at 14), (3) UNUM obtained approval from Merck on the initial termination letter before sending it to Epps-Malloy (see A.R. at 119, Fax Coversheet from Gloria Dukes to Jean Garoniak (with note "PLEASE REVIEW AND LET ME KNOW IF THIS IS OK TO SEND.")), and (4) a notation in Epps-Malloy's file, while difficult to read, indicates that Merck may have stated a desire to "proceed with termination."  (A.R. at 13.)  Moreover, it appears that UNUM and Merck began a process aimed at recharacterizing Epps-Malloy as

## G. Weighing of Factors

"To decide whether an administrator's termination of
benefits is arbitrary and capricious, we 'determine lawfulness by
taking account of several different, often case-specific,
factors, reaching a result by weighing all together.'"  Miller,
2011 WL 208291, at *15 (citing Glenn, 554 U.S. at 117).  The
Court gives significant weight here to Defendants' (1) reversal
of position and (2) failure to address Epps-Malloy's fibromyalgia
diagnosis.  The Court gives slightly less weight to Defendants'
failure to consider her objective functional capabilities.
Although not always required, the Court gives some weight to the
SSD decision.  Finally, the Court accords minimal weight to the
alleged structural conflict, as the parties presented no new
information after the Third Circuit's Kosiba decision.

Rather than an initial disability determination, we are
faced here with a situation where Defendants found Epps-Malloy
totally disabled once, then sought to revisit the determination
anew two years later, requiring her to provide entirely new
information.  Defendants then disregarded the historical medical
record, including the portions that led to their own first
finding of total disability.  When Epps-Malloy provided her

---

not disabled (A.R. at 18, 11-25-96 File Note ("Hopefully [return
to work] will be approved.").) However, because the full extent
and propriety of this involvement are unclear, the Court will not
base any decisions on it at this time.

doctors' opinions that she was still disabled, Defendants chose to ignore them, and the other information that established her disability the first time, without any supporting information to the contrary.  Dr. Dev's opinion obtained during the appeal stage was helpful, but it did not comprise substantial evidence because it failed to address all of her ailments and did not address her functional capabilities.  Viewing the various factors as a whole, the Court finds that Defendants' decision to terminate Epps-Malloy's LTD benefits was not the product of reasoned decision-making and substantial evidence.  See id.  Rather, the numerous procedural irregularities here lead us to conclude that Defendants' termination of Epps-Malloy's benefits was arbitrary and capricious.  See id.

**IV.  Remedy**

Until recently, the appropriate remedy for an improper termination of LTD benefits under Section 502(a)(1)(B) was unclear, especially in cases such as this where the record is incomplete or where the plan administrator has failed to make adequate findings.  See Dunn, 2009 WL 2848662, at *19 & n.10.  However, Miller provides the answer where, as here, the plan administrator previously granted LTD benefits and improperly terminated them:

> In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination. As such, an important distinction emerges between an initial

48

> denial of benefits and a termination of benefits after they
> were already awarded.  In a situation where benefits are
> improperly denied at the outset, it is appropriate to remand
> to the administrator for full consideration of whether the
> claimant is disabled.  To restore the status quo, the
> claimant would be entitled to have the plan administrator
> reevaluate the case using reasonable discretion.  In the
> termination context, however, a finding that a decision was
> arbitrary and capricious means that the administrator
> terminated the claimant's benefits unlawfully.  Accordingly,
> benefits should be reinstated to restore the status quo.

Miller, 2011 WL 208291, at *16 (citing Sixth, Seventh, and Ninth

Circuit cases granting retroactive reinstatement in termination

context) (internal citation omitted).

Defendants approved Epps-Malloy's LTD benefits for twenty-

four months under the "own-occupation" standard and then

additionally classified her as disabled under the "any-

occupation" standard.  (A.R. at 406, 10-9-92 Letter from Jean J.

Copp; A.R. at 235, 10-5-93 Letter from Corey Bulluck.)

Defendants subsequently investigated and then reaffirmed her LTD

benefits in 1994.  On the thin record before us, if Defendants

had denied her "any-occupation" LTD benefits from the outset, the

Court would likely remand.  Miller, 2011 WL 208291, at *16

("where benefits are improperly denied at the outset, it is

appropriate to remand to the administrator").  But because

Defendants initially classified her as disabled from "any

occupation" and then arbitrarily and capriciously changed this

classification, we conclude that Epps-Malloy's benefits should be

retroactively reinstated.  Id. ("In the termination context . . .

a finding that a decision was arbitrary and capricious means . . . benefits should be reinstated to restore the status quo.").[23]

## CONCLUSION

For the reasons discussed, the Court will grant Epps-Malloy's Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.  The Court will issue an appropriate order.


___s/ Mary L. Cooper_____
**MARY L. COOPER**
United States District Judge


Dated: March 7, 2011

---

[23] The Court does not consider relevant the fact that Miller was receiving "own-occupation" LTD benefits whereas here Epps-Malloy was receiving "any-occupation" LTD benefits.  In both cases, the administrator granted one type of LTD benefits and rescinded the same using procedurally deficient mechanisms. Here, Defendants explicitly granted "any-occupation" LTD benefits on this admittedly thin record, and then arbitrarily and capriciously revoked them.  Absent this unlawful decision, the status quo consists of Epps-Malloy continuing to receive LTD benefits.